# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

INGE GOODSON,               )

                                 )

        **Plaintiff,**          )

                                 )

**v.**                           )      **Case No. 3:13-cv-0487**

                                 )      **Judge Aleta A. Trauger**

**PATRICK DONAHOE, in his official capacity**  )

**as Postmaster General of the United States**  )

**Postal Service,**              )

                                 )

        **Defendant.**        )

## MEMORANDUM

Pending before the court is a Motion for Summary Judgment filed by the defendant (Docket No. 51), to which the plaintiff has filed a Response in opposition (Docket No. 59), and the defendant has filed a Reply (Docket No. 68). For the reasons discussed herein, the motion will be granted.

## BACKGROUND[1]

This case arises from the plaintiff Inge Goodson's employment as a career, full time rural carrier for the Fairview, Tennessee branch of the United States Post Office. There were three locations on the plaintiff's route (Rural Route 6) which had centralized box units ("CBUs"): the Roundtree Apartments ("Roundtree"), the Meadows Condominiums, and a trailer park. A former postmaster, Harold Scott, instructed the plaintiff that – consistent with the policy for post office boxes – the plaintiff did not have to deliver certain types of non-first-class mail known as box holders (which included some mass mail advertisement ("ADVOS") and a weekly

---

[1] The facts in this section are undisputed and are drawn from the plaintiff's Response to the defendant's Statement of Undisputed Facts. (Docket No. 60.)

newspaper known as the Fairview Shopper) to CBUs that were overfull, broken, vacant, blocked, or which belonged to a customer who had moved and not provided a forwarding address. Another prior postmaster, Betty Lawson, also told the plaintiff that she might leave box holders for Roundtree residents in a location other than the CBUs if the apartment manager agreed. Neither postmaster instructed the plaintiff that she had blanket permission to not deliver the box holders to Roundtree or to discard them without attempting delivery.

From November 2006 onward, the plaintiff's direct supervisor was Roy Ray, who was employed as the Officer in Charge of the Fairview Post Office. On November 16, 2007, following an investigation and interview of the plaintiff by the Office of the Inspector General ("OIG"), Mr. Ray placed the plaintiff on emergency non-duty status for discarding deliverable mail, namely box holders that should have been delivered to CBUs on her route. On January 2, 2008, Mr. Ray requested the plaintiff's removal from employment for discarding mail. By Memorandum dated January 17, 2008, the plaintiff was officially advised that she was being removed from service related to incidents on November 1, November 14, and November 15, 2007 in which Mr. Ray and agents from the OIG allegedly discovered deliverable box holders discarded in bulk by the plaintiff. The plaintiff's last day in pay status was February 29, 2008.

The plaintiff first contacted an Equal Employment Opportunity Commission ("EEOC") counselor on January 9, 2008 and, in February of 2008, she filed a formal EEOC charge alleging gender discrimination and sexual harassment.

**PROCEDURAL HISTORY**

On May 22, 2013, the plaintiff filed the initial complaint in this action, bringing claims against the defendant for violation of Title VII, 42 U.S.C. § 2000e; violation of the Tennessee Human Rights Act, T.C.A. §§ 4-21-101 *et seq*; and retaliation under the common law of

Tennessee.  (Docket No. 1.)  The plaintiff specifically indicated that her Title VII claims included claims for discrimination, retaliation, and sexual harassment or hostile work environment.  (*See Id.* ¶¶ 42, 48.)

On October 31, 2013, the defendant filed a Motion for Partial Dismissal under Rule 12(b)(6), seeking to dismiss: 1) the state law claims on the grounds that Title VII is the exclusive remedy for employment discrimination; 2) the Title VII hostile work environment claim on the grounds that all of the alleged incidents of sexual harassment took place more than 45 days prior to the plaintiff's contact with an EEOC counselor and were, therefore, not timely administratively exhausted under 29 C.F.R. § 1614.105(a)(1); and 3) the Title VII retaliation claim on the grounds that the plaintiff expressly declined to pursue a retaliation claim in the administrative proceedings before the EEOC.  (Docket Nos. 12, 13.)  The defendant also argued that the Title VII gender discrimination claim could not survive under § 1614.105(a)(1), to the extent it arose from the plaintiff's placement on emergency leave, which also took place more than 45 days before the plaintiff contacted an EEOC counselor.  (Docket No. 13.)  To support its argument, the defendant concurrently filed the Declaration of Michael W. Faber, a Paralegal Specialist employed by the United States Post Office, along with attached exhibits.  (Docket No. 14.)  The only claim the defendant did not move to dismiss was the Title VII gender discrimination claim as related to the plaintiff's ultimate termination in January of 2008.

On November 14, 2013, the plaintiff filed a Motion to Amend/Correct Complaint along with a proposed Amended Complaint that no longer included the state law claims or the Title VII retaliation claim. (Docket Nos. 17, 18.)  On the same day, the plaintiff also filed a Response in Opposition to the defendant's Motion for Partial Dismissal, along with an accompanying Memorandum of Law, arguing that 1) the Amended Complaint would render the Motion for

Partial Dismissal moot with respect to the Title VII retaliation and state law claims, and 2) the Title VII sexual harassment and gender discrimination claims related to the plaintiff's emergency placement should not be dismissed under § 1614.105(a)(1), because they were subject to both statutory exceptions under § 1614.105(a)(2) and equitable tolling.  (Docket Nos. 15, 16.)

On November 15, 2013, the court issued an Order granting the plaintiff's Motion to Amend Complaint and denying as moot the defendant's Motion for Partial Dismissal (which the court had re-characterized as a Motion for Partial Summary Judgment).  (Docket No. 21.)

On November 20, 2013, the plaintiff filed the Amended Complaint, bringing only Title VII claims for gender discrimination and sexual harassment.  (Docket No. 22.)  The Amended Complaint challenges the basis for the plaintiff's placement on emergency status and termination and alleges that, under an informal policy known as the "box holder policy," the plaintiff was not required to deliver box holders to the CBUs on her route – with the exception of mailboxes belonging to known long-term residents who retrieved their mail daily – in order to prevent the littering that would occur around these CBUs when residents would toss away unwanted mass mailings.  (*Id*. ¶¶ 11-13.)  The Amended Complaint goes on to allege incidents of sexual harassment by Mr. Ray, raise general allegations that the plaintiff was treated differently than similarly situated employees because of her gender (without identifying any specific similarly situated employees), allege that the plaintiff was subjected to ongoing gender-based harassment creating a hostile work environment, and conclude with the allegation that her termination for discarding box holders was actually motivated by her gender and her refusal of Mr. Ray's sexual advances.  (*Id*. ¶¶ 15-30, 50.)  Finally, the Amended Complaint alleges that the plaintiff was not aware of time limits for EEOC activity, was not aware of any EEOC posters in her workplace,

had received no formal EEOC training, and had been led to believe that all avenues for her complaints were being handled by her employee union representative.  (*Id.* ¶¶ 35-44.)

On December 23, 2013, the defendant filed an Answer.  (Docket No. 26.)

On August 19, 2015, the defendant filed a Motion for Summary Judgment (Docket No. 51) along with a Statement of Undisputed Facts (Docket No. 53), and on August 20, 2015, the defendant filed a Memorandum in Support (Docket No. 55).  The defendant asserts – in both the Statement of Undisputed Facts and the Memorandum in Support of the Motion for Summary Judgment – that, under Federal Rule of Civil Procedure 36, the court should deem admitted all of the facts laid out in Defendant's First Set of Admissions (the "RFAs"), sent to the plaintiff's counsel via overnight mail on June 7, 2014 (Docket No. 55-1 (Ex. A)), to which the plaintiff never responded.  (Docket No. 53, p. 1; Docket No. 55, p. 2.)  The RFAs are accompanied by a signed Certificate of Service, confirming that they were sent to the plaintiff's counsel by overnight mail on June 7, 2014.  (Docket No. 55-1 (Ex. A), p. 25.)  The RFAs include – among others – the following pertinent statements:

- "Plaintiff failed to properly and timely administratively exhaust her claims of Title VII discrimination or harassment regarding any alleged act of discrimination or harassment which occurred more than 45 days prior to her initial contact with an EEOC counselor (i.e., before November 25, 2007)."  (Docket No. 55-1 (Ex. A) ¶ 2.)

- "Plaintiff failed to properly and timely administratively exhaust her claim of Title [VII] discrimination regarding being placed on Emergency Placement on or about November 16, 2007."  (*Id.* ¶ 3.)

- "None of Plaintiff's allegations concerning alleged inappropriate sexual behavior by Mr. Roy Ray occurred on or after November 16, 2007."  (*Id.* ¶ 4.)

- "Plaintiff failed to properly and timely administratively exhaust her claim of Title [VII] discrimination regarding allegations concerning alleged inappropriate sexual behavior by Mr. Roy Ray."  (*Id.* ¶ 5.)

- "Mr. [Ray's] alleged harassing behavior did not culminate in Plaintiff's removal." (*Id.* ¶ 6.)

- "The Postal Service exercised reasonable care to prevent and correct any alleged sexually harassing behavior by Mr. Ray toward Plaintiff after any postal official received notice of any such allegation. Plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the Postal Service or to avoid harm prior to her contact with an EEO Counselor on or about January 9, 2008." (*Id.* ¶¶ 9-10.)

- "Plaintiff's Notice of Removal dated on or about January 17, 2008, was not causally connected to any alleged sexual harassment by Mr. Roy Ray." (*Id.* 11.)

- "The interactions between Mr. Roy Ray and Plaintiff between October 2006 and January 2008 were not severe or pervasive enough to amount to an actionable Title VII hostile work environment." (*Id.* ¶ 12.)

- "The interactions between Mr. Roy Ray and Plaintiff between October 2006 and January 2007 were not based on Plaintiff's sex or gender." (*Id.* ¶ 13.)

- "Plaintiff was not allowed to discard mail destined for a 'live' box, without at least attempting delivery, based on her knowledge of who regularly picked up their mail from such boxes." (*Id.* ¶ 35.)

- "Plaintiff did not report any allegations of inappropriate sexual behavior to any postal official before she contacted an EEO counselor on January 9, 2008." (*Id.* ¶ 43.)

- "On November 16, 2007, OIG Agents Koivula and Brummal interviewed Plaintiff. Before the interview began, Plaintiff signed an Acknowledgment of Rights form and voluntarily talked to the agents. Before questioning her about the discarded mail, the Agents asked her about her usual routine. Her explanation to the Agents indicated that she knew she was required to deliver all deliverable mail and that she had no authority to dispose of a customer's mail. During the interview, Plaintiff admitted that she 'only delivers ADVO to approximately seven' Roundtree residents. During the interview, Plaintiff admitted on 'heavy mail volume days,' such as what she had experienced that week, she did not deliver ADVOs to the Meadows residents." (*Id.* ¶¶ 102-07.)

- "Plaintiff's training records indicate that she received sexual harassment and EEO training in 2005 and 2006. During Plaintiff's postal employment at the Fairview facility, and during the allegations in this case, EEO posters were posted at the facility with instructions on how to report an allegation of discrimination or harassment." (*Id.* ¶¶ 122-23.)

On September 16, 2015, the plaintiff filed a Response and Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, to which she attached a number of supporting affidavits and other documents (Docket No. 59) along with a Response to the defendant's Statement of Undisputed Facts (Docket No. 60).

In her Response and Memorandum of Law, the plaintiff asserted that "a response to the Requests for Admissions was emailed to Defendant's counsel in August, 2014 by counsel's administrative assistant. Unbeknownst to Plaintiff, Defendant did not receive Plaintiff's responses." (Docket No. 59, p[p. 36-37.) To support this assertion, the plaintiff cited only to Exhibit 47 attached to the Memorandum. *Id*. Exhibit 47 contains the plaintiff's Response to the RFAs, but this document is unsigned and undated, as is the attached Certificate of Service. The plaintiff did not cite to, nor can the court locate in the exhibits to the plaintiff's Memorandum or elsewhere in the record, a signed affidavit from the plaintiff's counsel or his administrative assistant, or any other documentation, confirming that this response was sent. Nor has the plaintiff moved the court for any kind of relief.

On October 9, 2015, the defendant filed a Reply.

## ANALYSIS

Before the court can reach the summary judgment motion, it must first consider whether it is proper – as the defendant argues – to deem admitted the statements contained in the RFAs. Then, the court can turn to whether, in light of those admissions, the plaintiff has produced evidence that, when viewed in the light most favorable to the plaintiff, will still allow her claims to survive as a matter of law.

## I.      Federal Rule of Civil Procedure 36 and the RFAs

Under Rule 36(a)(3), "[a] matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney." The Sixth Circuit has held that a failure to timely respond to a request for admission, without moving the court to amend the response and providing proper justification for the untimeliness, is grounds for deeming the statements admitted and granting summary judgment on the basis of the admissions. *See Coal Creek Mining & Mfg. Co. v. James River Coal Service Co.*, 11 F. App'x 548 (6th Cir. June 6, 2001); *Heller Fin., Inc. v. Pandhi*, Nos. 88-6020-88-6037, 1999 WL 136091 (6th Cir. Nov. 9, 1989).

The plaintiff does not dispute that the RFAs were served on the plaintiff's counsel in June of 2014, nor does she put forth sufficient evidence to refute the defendant's allegation that she did not respond to the RFAs. The plaintiff's bald assertion that the responses were emailed in August of 2014 (which, it appears, would have been untimely anyway) accompanied by no evidence other than unsigned and undated responses, with an attached unsigned and undated certificate of service, will not suffice. The court finds that, not only did the plaintiff fail to timely respond to the RFAs, but, in fact, the plaintiff has failed to respond to the RFAs at all. Moreover, the plaintiff has made no motion to the court regarding the missing response nor is there any evidence in the record that the plaintiff otherwise attempted to communicate with the defendant. The plaintiff argues that it is the defendant's responsibility under Rule 36 to have moved for the facts to be deemed admitted (Docket No. 59, pp. 36-37). This position is directly contradicted by the plain language of Rule 36(b), which states that "[a] matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended," clearly referencing a motion by the party seeking to avoid the

8

admission. Nor is the plaintiff's position supported by the plaintiff's cited cases, which actually concern motions brought by parties to request that the court accept their late responses to requests for admission (a motion that the plaintiff has not brought). *See Beatty v. U.S.*, 983 F.2d 908 (8th Cir. 1993); *F.D.I.C. v. Prusia*, 18 F.3d 637 (8th Cir. 1994).

Other cases the plaintiff cites are similarly inapposite. The plaintiff cites two cases, from jurisdictions not binding on this court, in which the court declined to admit facts contained in requests for admission where responses were untimely; in both of those cases, however, the responses were filed late, rather than not at all, and the court found no prejudice to the defendants from the untimely response. *See Flohr v. Penn. Power & Light Co.*, 821 F. Supp. 301 (E.D. Pa. 1993); *Secrease v. Secrease*, No. 3:04-bk-11726 (Bankr. E.D. Ark. May 17, 2005). Lastly, the plaintiff cites a case from the Tennessee Supreme Court, regarding a comparable Tennessee rule of procedure, suggesting that, under Tennessee law, the party seeking to have the untimely answered requests for admission deemed admitted should bring the issue to the court's attention prior to trial. *Tenn. Dep't of Human Servs. v. Barbee*, 714 S.W.2d 263 (Tenn. 1986). Not only is this court not bound by a state court's interpretation of a similar procedural rule, but the court also finds that the analysis in *Barbee* actually undermines, rather than supports, the plaintiff's position. The *Barbee* court was primarily concerned with the propriety of a defendant's waiting until *trial* to assert that it was relying on requests for admission being deemed admitted, and expressly stated that the defendant should have brought the issue to the court's attention at an earlier stage, such as *summary judgment*, precisely as the defendant has done here. *Id.*

Ultimately, the court is not swayed by the plaintiff's argument. The court finds that Rule 36 necessitates the admission of the facts contained in the RFAs in light of the fact that discovery

is now closed, it is the eve of trial, and the plaintiff has never responded at all to the RFAs, has never moved the court for amendment or withdrawal, and has not provided any justification for the failure to do so.

## II.     Summary Judgment on Plaintiff's Claims

While a summary judgment motion typically requires the court to look at all of the facts in the record in the light most favorable to the plaintiff, in this instance the court will look only to the evidence that the plaintiff puts forth that has not already been undermined or rendered moot by the admissions contained in the RFAs that the court has deemed admitted.

### A.  Legal Standard

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id*. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the

party's proof must be more than "merely colorable." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249, 252 (1986). An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

**B. The Plaintiff's Evidence**

The court herein recounts the plainitff's evidence related to two main issues that are, for the reasons discussed more fully below, pertinent to the analysis despite the admissions in the RFAs: 1) employees outside of the plaintiff's protected class who the plaintiff alleges were treated differently than she was by the defendant, and 2) the plaintiff's actual and constructive knowledge of the relevant EEOC procedural requirements.

*1. Non-Protected Employees*

In her Response and Memorandum of Law, the plaintiff references only two fellow employees outside of her protected class. The first is Scott Ovens, who worked as the plaintiff's substitute carrier, delivering the mail on Route 6 on Saturdays and on days when the plaintiff was absent, and who the plaintiff alleges "became the assigned full time carrier for route 6" after she was placed on emergency non-duty status. (Docket No. 59-51, ¶ 15.) The plaintiff does not allege, nor is there evidence in the record establishing that Mr. Ovens was actually given the plaintiff's position as a career, full-time carrier, rather than simply being assigned to take over her duties while she was on non-duty status (as he was already the plaintiff's substitute carrier). Moreover, the plaintiff's evidence does not confirm whether Mr. Ovens continued to perform these duties after the point in time when the plaintiff was officially terminated in January of 2008; before that time, the position ostensibly still belonged to the plaintiff. In fact, the plaintiff does not allege, nor does the record reflect, who – if anyone – replaced the plaintiff in her career, full-time position after she was terminated. The second male employee cited by the plaintiff is

Chris Haithcoat, who the plaintiff alleges was a rural carrier on a different route, but who also

worked for the Fairview Post Office under supervisor Roy Ray.  (Docket No. 59-36, pp. 6, 9.)

The plaintiff included the following evidence regarding her allegations that Mr. Ovens

discarded deliverable mail but was not disciplined.  Viki Mitchell, who worked as a rural carrier

at the Fairview Post Office from 1991 to 2014, stated in an affidavit that Mr. Ovens worked as a

substitute carrier for the plaintiff for two years prior to her placement on emergency non-duty

status and in the weeks immediately afterwards.  (Docket No. 59-6, ¶ 8.)  Ms. Mitchell stated

that, approximately six weeks after Ms. Goodson's termination, she went to some of the

apartments on Ms. Goodson's route and got signed statements from some residents that they

"had not received ADVOS in a long while, including the weeks Ms. Goodson's substitute

carrier, Scott Ovens, was working."  Id.  Ms. Mitchell said she presented these statements to Mr.

Ray, and he became angry but did not investigate or fire Mr. Ovens.  *Id.*  To support this

allegation, the plaintiff placed in the record five copies of a document that states, "When the sub

carrier on RT 6 for the Fairview Post Office, Scott Ovens, is working on Monday, Tuesday,

Wednesday, Thursday, or Friday, I did/do not receive Advo/shoppers (box holders)," all signed

by what appear to be residents of the Roundtree Apartments and all dated December 26, 2007.

(Docket No. 59-20.)  Three of the five residents additionally handwrote on these documents that

they had begun receiving ADVOS within the last several weeks (presumably during the time Mr.

Ovens was delivering the mail while the plaintiff was on emergency non-duty status).  (Id. at pp.

4, 6-7.)  There is no additional information about the condition of their mailboxes or any other

information about ADVOs they were supposed to have received but did not and when or what

procedures Mr. Ovens practiced while delivering the mail.  In another letter signed by Ms.

Mitchell, she also stated that she heard from customers that they had witnessed Mr. Ovens

"delivering mail to both sides of the road at one time" and that "they received the incorrect mail all down the road," as well as some other customer complaints about misplaced mail. An affidavit by the plaintiff and a signed statement by Wanda Coone – another rural carrier for the Fairview Tennessee Post Office – also allege that Mr. Ovens substituted for the plaintiff during the week of November 5 through November 9, 2007, the week prior to the plaintiff's placement on emergency non-duty status, that he indicated he intended to deliver some box holders that week, and that he may, therefore, have been responsible for some of the discarded box holders that were found by Mr. Ray and the OIG investigators the following week and attributed to the plaintiff. (Docket 59-51, ¶ 25; Docket No. 59-34, p. 2.)

With respect to Mr. Haithcoat, the statement by Ms. Coone states that, on one Monday afternoon in December, she saw Mr. Haithcoat pull up to a dumpster outside the post office and take "advo boxholders and straps out of his jeep and [throw] them in the dumpster" and that she told Mr. Ray about it the next day, but he said he did not see anything in the dumpster. (Docket No. 59-34, pp. 3-4.) She did not say how many ADVOs he threw away or offer any other information.

### 2. Plaintiff's Notice of EEOC Procedures

In her affidavit, the plaintiff states the following with respect to her knowledge of EEOC procedures:

> I was informed by my Union representatives that the discrimination would be investigated and remedied if I filed a grievance following the Union grievance procedure. I was not informed that I needed to report to any other agency (such as the EEO) or hire an attorney. The Union did not suggest or volunteer any other options until Feb. 2008. After receiving no remedy by filing the Union grievances, I sought help from the EEO. At that time, I was not aware of any time limits for EEO activity, was not aware of any EEO posters in the facility, and had received no formal training on EEO procedures. Although my records indicate that I received training, the sexual harassment and EEO training were NOT

13

adequate.  I was not notified of the time limits and not otherwise aware of them.  I was unfamiliar with the EEO and did not even know what the initials stood for. The Postal Service did not properly inform me of the training, or provide me with educational material concerning the EEO.  The posters were covered and blocked. The office is very small and there were six letter cases lining the walls and blocking whatever posters were there.  The Postmaster Baker-Lawson allowed the training videos to play on a small TV in the corner of the office and allow[ed] the carriers to continue working, nobody was paying attention.  I recall no EEO posters.  There were no new posters put up inside the Fairview Post Office in over 9 years that I know of.  The posters that were visible have no numbers or addresses on them for a victim to contact.

(Docket No. 59-51, ¶ 37.)  Nowhere in the record does the plaintiff allege, or provide evidence, that she asked the union representatives, or anyone else at the Postal Service, about remedies aside from the union grievance that might be open to her, let alone that she inquired specifically about EEOC procedures or made any other efforts to learn about the EEOC process.

### C.  Timeliness of Administrative Exhaustion and Equitable Tolling

As the parties agree, 29 C.F.R. § 1614.105(a)(1) requires that "[a]n aggrieved person must initiate contact with [an EEOC] Counselor within 45 days of the date of the matter alleged to be discriminatory, or in the case of personnel action, within 45 days of the effective date of the action."  "Failure to timely seek EEO counseling is grounds for dismissal of the discrimination claims."  *Hunter v. Sec'y of the U.S. Army*, 565 F.3d 986, 993 (6th Cir. 2009); *see also Steiner v. Henderson*, 354 F.3d 432, 435 (6th Cir. 2003); *McFarland v. Henderson*, 307 F.3d 402 (6th Cir. 2002).  The parties also agree that the plaintiff first contacted an EEOC counselor on January 9, 2008 and, therefore, any alleged actions that took place prior to November 25, 2007 were outside of the 45-day window.  The plaintiff raises two arguments to avoid summary judgment on claims arising from events prior to November 25, 2007: 1) the doctrine of equitable tolling and 2) the exceptions to § 1614.105(a)(1) found within the subsequent subsection of the same statute.

### 1.  *Equitable Tolling*

The court notes, as an initial matter, that there is a close question as to whether the plaintiff's admission that she did not timely administratively exhaust her claims also precludes her equitable tolling argument. Ultimately, however, the court finds that it would not be wholly inconsistent for the plaintiff to admit that her claim was not timely exhausted but also to argue that her claim should be permitted to proceed under a theory of equitable tolling. Nevertheless, for the following reasons, tolling is not warranted in this instance.

The Sixth Circuit has held that a tolling analysis in this context requires consideration of the following factors: 1) whether the plaintiff had actual notice of the time restraint, 2) whether she had constructive notice of the time restraint, 3) the degree of diligence exerted in pursuing her rights, 4) the degree of prejudice to the defendant, and 5) the reasonableness of plaintiff's ignorance of the time constraint. *Steiner v. Henderson*, 354 F.3d 432, 435 (6th Cir. 2003) (finding that tolling was not warranted in a Title VII gender discrimination action, where the plaintiff was aware of the time limitations for an EEOC complaint but did not contact an EEOC counselor within 45 days, while making efforts to pursue other internal grievance procedures). The plaintiff puts forth evidence that she did not have actual knowledge of the time limitations, but the other factors do not weigh in her favor.

First, according to the admitted RFAs: 1) there were EEOC posters in the plaintiff's work facility with instructions about how to file an EEOC claim, and 2) the plaintiff's personnel records reflect that she received EEOC training. Moreover, the facts the plaintiff placed in the record elaborating on these issues only serve to further confirm that the plaintiff was, in fact, aware of the posters and did, in fact, participate in the training and, thus, had constructive notice of the EEOC procedures. Even though the plaintiff states that the training videos played in a corner while carriers were allowed to continue working, the fact is she recalls the videos playing.

The plaintiff also makes inconsistent statements about whether the EEOC posters were entirely visible, which evidence ultimately demonstrates that the posters were at least partially visible and that she, therefore, had notice that there was other information she could have tried to access. Moreover, her recollection of the training videos and posters renders her lack of knowledge about the timing of the EEOC procedures unreasonable, as it is due to her own failure to pay attention, follow up on leads, or ask questions. She does not show that she made any efforts, let alone was diligent, in trying to ascertain information about the EEOC process. She states that her union representative did not actively offer her information about the EEOC procedures but not that she ever directly inquired of the union, or of anyone else, about the EEOC procedures, despite having been exposed to the posters and the training video. Finally, her pursuit of her union grievance during the 45-day period during which she should have contacted the EEOC shows that she was capable of timely pursuing her claims with the EEOC as well but failed to do so. The court, therefore, cannot find that the plaintiff is entitled to equitable tolling.

### 2. *Statutory Exception to the 45-Day Requirement*

Unlike with equitable tolling, the plaintiff's admission that she did not timely administratively exhaust her claims arising prior to November 25, 2007 should most fairly be read to summarily preclude any argument that she qualified for the statutory exception to the 45-day rule (because, if the statutory exception applies, then her contacting the EEOC counselor more than 45 days later would not have been untimely). Even if the court were to consider the plaintiff's statutory argument, however, the plaintiff nevertheless fails to meet the elements of any of the statutory exceptions.

Under § 1614.105(a)(2):

> The agency or the Commission shall extend the 45-day time limit in paragraph (a)(1) of this section when the individual shows that he or she was not notified of the time limits and was not otherwise aware of them, that he or she did not know and reasonably should not have been known that the discriminatory matter or personnel action occurred, that despite due diligence he or she was prevented by circumstances beyond his or her control from contacting the counselor within the time limits, or for other reasons considered sufficient by the agency or the Commission.

The plaintiff argues that two of these grounds apply for extending the time period in this instance. First, she argues that she did not have notice of the timing requirements of an EEOC complaint, an argument that the court has already found is not supported by the record for the reasons discussed above. Second, she argues that she was prevented by circumstances beyond her control from timely contacting the EEOC counselor, due to her allegations that the union counselor did not tell her that she should contact the EEOC. The court notes that there is actually no evidence that the union representative said anything at all about the EEOC process, nor that the plaintiff inquired. Moreover, a plaintiff's argument that she was prevented by circumstances beyond her control from timely contacting an EEOC counselor based on a "union steward's failure to file a grievance on her behalf" was rejected in an appellate decision that this court finds persuasive:

> The forty-five day statute of limitations for contacting an EEO counselor runs from the date of the adverse employment action. We have never held that the time limit is tolled by an employee's decision to initiate union grievance procedures. Indeed, postal workers can pursue both statutory and grievance procedures simultaneously, and the decision to forgo one does not affect the other.

*O'Hara v. Donahoe*, 595 F. App'x 367, 371 (5th Cir. Dec. 19, 2014) (internal citations omitted).

The court finds that the plaintiff has not demonstrated that she fits within any statutory exception under § 1614.105(a)(2).

**D. Title VII Claims**

The plaintiff raises two claims in this action, both under Title VII: gender discrimination and hostile work environment. Despite use of the word "retaliation" in the Case Management Order and in the briefing, the court finds that the plaintiff has not put forth a claim of Title VII retaliation. Not only is this claim not referenced in the Amended Complaint and not analyzed in the briefing, the plaintiff expressly stated in the motions that accompanied the filing of the Amended Complaint that the retaliation claim was no longer at issue.

### 1. Sexual Harassment/Hostile Work Environment Claim

Because of the plaintiff's failure to timely administratively exhaust and the court's finding that equitable tolling does not apply, the plaintiff's claim for sexual harassment or hostile work environment will not be entertained with respect to any allegations that took place prior to November 25, 2007. This includes all allegations of improper conduct by Mr. Ray that are included in the plaintiff's Complaint, and the plaintiff further admits through the RFAs that no improper conduct took place after November 16, 2007. Moreover, the plaintiff is deemed to have admitted that any improper conduct by Mr. Ray did not culminate in, and is not causally connected to, her termination, which is the only alleged adverse event that took place after November 25, 2007. Therefore, the court finds that summary judgment is appropriate on plaintiff's sexual harassment and hostile work environment claims.

The court notes, however, that, even if these claims were not barred due to the timeliness of exhaustion, the plaintiff still would be unable to survive summary judgment. Since the plaintiff's termination was based on the same investigation and findings that first resulted in her placement in emergency non-duty status, the plaintiff's deemed admission that the termination was not related to the allegations of sexual harassment necessitates a finding that the alleged harassment was also not connected to the plaintiff's placement on emergency non-duty status.

18

Therefore, the plaintiff has failed to assert a claim of sexual harassment that resulted in any adverse employment decision, leaving the plaintiff with only a claim for a hostile work environment that did not result in a tangible employment action. This claim could not proceed, as a matter of law, due to the plaintiff's deemed admissions that 1) the alleged conduct by Mr. Ray was not severe or pervasive enough to constitute a hostile work environment, and 2) she did not report the harassment or attempt to take advantage of any preventive or corrective opportunities provided by the Postal Service, despite the defendant's exercise of reasonable care to prevent and correct any alleged sexually harassing behavior by Mr. Ray toward the plaintiff. *See, e.g. Morris v. Oldham County Fiscal Court*, 201 F.3d 784 (6th Cir. 2000) (a claim of sexual harassment by a supervisor that did not result in a tangible employment action requires a showing that the harassment was severe or pervasive and is subject to the affirmative defense that the employer exercised reasonable care to prevent or correct the behavior, and the plaintiff unreasonably failed to take advantage of these measures). Accordingly, the court will grant summary judgment to the defendant on the plaintiff's sexual harassment/hostile work environment claim.

### 2. *Gender Discrimination Claim*

With respect to the plaintiff's gender discrimination claim, she is deemed to have admitted that Mr. Ray's interactions with her through January of 2008 (which includes her termination) were not related to her sex or gender. This admission alone effectively precludes the plaintiff from raising a gender discrimination claim based on her termination, since her termination was initiated by Mr. Ray. Moreover, the court also finds that the evidence the plaintiff has put forth does not give rise to even a *prima facie* case of gender discrimination.

As an initial matter, there is no direct evidence in the record of gender discrimination and, thus, in order to survive summary judgment based on circumstantial evidence, the plaintiff would first need to establish a *prima facie* case and then, if the defendant offers a non-discriminatory reason, demonstrate that the proffered reason is pretextual. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). A *prima facie* case for gender discrimination under *McDonnell Douglas* requires a showing by the plaintiff that 1) she is a member of a protected class, 2) she was qualified for her job, 3) she suffered an adverse employment decision, and 4) she was replaced by a person outside of her protected class or treated differently than similarly situated non-protected employees. *See, e.g., White v. Baxter Healthcare, Corp.*, 533 F.3d 381, 391 (6th Cir. 2008); *Fullen v. City of Columbus*, 514 F. App'x 601, 605 (6th Cir. 2013) (citing *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001)). The plaintiff has not offered any evidence that, after she was terminated, she was replaced by someone outside of her protected class. She only provides evidence that Mr. Ovens, who was already her substitute carrier, was assigned her route full-time while she was placed on emergency non-duty status but not that he, or anyone else, replaced her following her termination. Therefore, the only way the plaintiff can make a *prima facie* showing of gender discrimination is to demonstrate that "for the same or similar conduct [she] was treated differently than similarly-situated male employees." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (finding no prima facie case of gender discrimination related to plaintiff's termination, where she "failed to produce sufficient affirmative evidence to establish that the non-minority employees with whom she compares her treatment were 'similarly situated in all respects' or that their conduct was of 'comparable seriousness' to the conduct for which she was discharged).

The plaintiff's allegations regarding Scott Ovens and Chris Haithcoat do not support an argument that similarly situated male employees were treated differently than the plaintiff for similar conduct. First, the plaintiff has not demonstrated that Scott Ovens was similarly situated to her, as she cannot even show that she and he held the same position: Mr. Ovens was a substitute, rather than a full-time, carrier. Moreover, the plaintiff has not put forth sufficient evidence to show that Mr. Ovens regularly failed to deliver box holders at a comparable level of seriousness to her own misconduct, in light of her admission to the OIG investigators that she regularly did not deliver box holders to the CBUs on her route. Even if Mr. Ovens was responsible for some of the discarded box holders that were found by Mr. Ray and the OIG investigators and attributed to the plaintiff, this does not undermine the fact that the investigators and Mr. Ray documented their findings that these box holders were the plaintiff's responsibility as the full-time carrier for the route, let alone the fact that the plaintiff admitted that she regularly did not deliver box holders. There is also little to be gleaned from the five statements signed by residents, stating that box holders were regularly not delivered to them during years when the plaintiff was the regular carrier and Mr. Ovens was her substitute, because there is no additional information about how often, if ever, Mr. Ovens may have been responsible for the box holders during those years. Further, three of those five statements actually say that, when Mr. Ovens was delivering mail in the weeks following the plaintiff's placement on non-duty status, the residents began to receive their box holders. Accordingly, there is no evidence that Mr. Ovens was either similarly situated to the plaintiff or was treated differently for misconduct of the same level of seriousness.

With respect to Mr. Haithcoat, who the plaintiff's evidence shows may have been similarly situated to the plaintiff, as he was also a full-time carrier in the same office reporting to

Mr. Ray, the plaintiff has provided no evidence of his alleged misconduct other than a statement that he was seen discarding box holders on one occasion. There is, additionally, no evidence regarding how many box holders he discarded or whether he had attempted to deliver them first but could not do so for legitimate reasons. This is substantially different from the plaintiff's admission to the OIG officers that she regularly did not deliver box holders to CBUs on her route, as substantiated by the investigator's and Mr. Ray's findings on multiple occasions that she had discarded deliverable mail. The evidence, therefore, does not give rise to a reasonable inference that Mr. Haithcoat was treated differently than the plaintiff for misconduct of comparable seriousness.

The court, therefore, need not reach the question of whether the defendant's stated reason for terminating the plaintiff is pretext. Even assuming the plaintiff were able to make out a *prima facie* case on the basis that she was terminated and Mr. Ovens took over her full-time duties, the plaintiff still has not put forth evidence of pretext because the plaintiff cannot show that the true motivation for her termination was "discriminatory animus." *Grace v. USCAR*, 521 F.3d 655, 677-678 (6th Cir. 2008) (holding that a female plaintiff who was terminated from her full-time position and whose job duties were then performed by a male employee for the same rate of compensation was able to make out a prima facie case of gender discrimination, despite that the male employee worked only part-time, but could not survive summary judgment because she could not show that her employers specifically looked for a man to replace her or that they had a policy of replacing female employees with male employees.) The plaintiff has shown only that her job duties were reassigned (at least temporarily) to the person who was already her substitute carrier, but she has shown no evidence that gender effected either the decision to terminate her or the decision to assign her duties to Mr. Ovens.

22

Moreover, while the plaintiff did not clearly articulate a mixed-motive theory of gender discrimination (*i.e.* that her termination was based on both her gender *and* her discarding of mail), the court finds that such a claim would nevertheless also fail as a matter of law because – as discussed above – the plaintiff has not shown any direct or circumstantial evidence of gender discrimination. *See White.* 533 F.3d at 396 (in order to survive summary judgment on a mixed-motive theory, while the full *McDonnell Douglas* framework does not apply and there is no need to prove pretext, a plaintiff is still required to produce "evidence sufficient to convince a jury that . . . race, color, religion, sex, or national origin was a motivating factor for the defendant's adverse employment action").

Without embarking on a full discussion of the plaintiff's evidence on these issues, the court notes that the plaintiff has put forth the argument that there were both informal understandings with her superiors that she need not attempt delivery of box holders to CBUs on her route and/or that parsing the CBUs on her route to determine where box holders could be delivered and where they could not would be unreasonably difficult. She has also raised the argument that terminating her for this offense was neither just nor warranted, in light of her allegations that she openly engaged in this practice and never received any advance warnings. Significantly, however, regardless of whether the plaintiff's termination was fair, she has simply not put forth sufficient evidence to suggest that it was based on, or motivated by, her gender and, therefore, her Title VII gender discrimination claim cannot survive summary judgment as a matter of law.

## CONCLUSION

For the foregoing reasons, the defendant's Motion for Summary Judgment will be granted and the plaintiff's claims will be dismissed with prejudice.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge